# STATE OF CONNECTICUT *v.* MARK DEMAIO
## (AC 27596)

Flynn, C. J., and Beach and McDonald, Js.

Argued January 17—officially released May 6, 2008

*John C. Drapp III,* special public defender, with whom, on the brief, was *Joseph A. Jaumann,* special public defender, for the appellant (defendant).

*Nancy L. Chupak,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Donald S. MacCalmon,* assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Mark DeMaio, appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics in violation of General Statutes § 21a-279 (a) and possession of narcotics within 1500 feet of a school in violation of General Statutes § 21a-279 (d). On appeal, the defendant claims that the trial court improperly denied his motions to suppress evidence. We affirm the judgment of the trial court.

Before trial, the defendant moved to suppress statements and physical evidence obtained by the police after an investigative stop that occurred in East Haven on September 23, 2005. The defendant claimed that the police had stopped him without the requisite reasonable and articulable suspicion required by the federal and state constitutions and that the results of that stop should be suppressed.

The court conducted a hearing on the defendant's motions, and the state presented testimony from Officers David Cari, Brian Kelly and Joseph Mulhern of the East Haven police department. These officers were involved in the events that occurred up to and including

the investigatory stop. The defendant presented testimony from Robert Moss, an investigator from the public defender's office.

At the conclusion of the hearing, the court found the following facts. On September 10, 2005, Cari, who had served for four years as a police officer and was trained in narcotics enforcement, arrested Paul DeMartino, a man whom Cari knew to be always truthful to him although DeMartino previously had never given Cari reliable information leading to an arrest. DeMartino informed Cari that he had purchased drugs numerous times from the defendant, a homeless man who peddled drugs. DeMartino informed Cari that the defendant was a drug courier for those coming to the Brick House Cafe and Michael's Cafe in East Haven. DeMartino told Cari that after the defendant asked him if he wanted to purchase drugs, the defendant would get on his ten speed bicycle and ride to the Wagon Wheel bar, a location in New Haven known to the police for drug transactions. According to DeMartino, the defendant would purchase drugs at the Wagon Wheel bar and, after placing the drugs in his bandana or in a pocket, would pedal back to East Haven and deliver the drugs. Cari himself knew the defendant was reputed to be a drug user and courier, and had seen the defendant riding into New Haven on his bicycle and returning to the Brick House Cafe or Michael's Cafe five or ten minutes later. Whenever Cari saw the defendant outside of these establishments, the defendant would run inside.

On September 23, 2005, at approximately 10:30 p.m., Cari was traveling westbound in a marked police car on Main Street in East Haven, when he observed the defendant leave the Brick House Cafe, mount his bicycle and ride westbound toward the New Haven town line. At this time, Cari requested unmarked vehicles to follow the defendant. Officers Mulhern and Kelly received information that the defendant was riding a

bicycle westbound on Main Street toward New Haven, where it was suspected that he would purchase drugs to bring back into East Haven. Mulhern and Kelly were in an unmarked, older model Mercedes to conduct surveillance. Mulhern and Kelly followed the defendant across the East Haven town line into New Haven to the Wagon Wheel bar, and Mulhern parked the vehicle across the street facing away from the bar. Mulhern and Kelly had a clear and unobstructed view of the side of the building.

Upon arriving at the Wagon Wheel bar at approximately 10:30 p.m., the defendant dismounted his bicycle and leaned it against the building. From their vantage point, there was enough light for Mulhern and Kelly to observe the defendant "milling around" in front of the Wagon Wheel bar. As the defendant was standing in front of the bar, Mulhern witnessed a man approach the defendant and a "hand-to-hand transfer" took place, which did not resemble a handshake. Mulhern testified that he understood a hand-to-hand transaction to be consistent with a drug or money transfer. The other man left, and the defendant got on his bicycle, which had been leaning against the side of the building, and waited. The defendant, who was below a second story window, looked up toward the window. As the defendant leaned against the building, this window opened, and an arm extended out of the window. The defendant then pedaled away. Officer Mulhern did not see anything drop but inferred that something had been dropped from the window.

After Kelly radioed other officers, Mulhern and Kelly, traveling approximately one quarter of a mile behind the defendant, followed the defendant toward East Haven, maintaining consistent radio contact with Cari. As Mulhern and Kelly were following the defendant, he turned into a gasoline station and the officers drove by. Mulhern and Kelly continued to drive toward East

Haven. At this point, other East Haven police officers followed the defendant into East Haven. Mulhern and Kelly drove to Dodge Avenue in East Haven, where Mulhern parked the car and shut off the vehicle's headlights while the officers waited for the defendant to reenter East Haven.

With East Haven police officers following him, the defendant turned left onto Burr Street and then turned onto Dodge Avenue. Kelly observed the defendant "erratically" riding "all over the road," and Kelly believed that the defendant posed a danger to himself and to others. A short time later, the defendant was stopped. Cari and other police officers also arrived at the scene after Kelly ordered the defendant to put his bicycle on the ground. The defendant complied, and Cari asked the defendant if he had any weapons or needles. The defendant informed Cari that he had a knife in his left front pocket. He also stated that he had a used needle in his sock. As Cari reached into the defendant's pocket to remove the knife, he felt a knife and what seemed to be, on the basis of his training and experience in narcotics enforcement, packaged narcotics in the form of a bundle of glassine envelopes wrapped with an elastic band. As Cari removed the knife and the bundle of glassine envelopes from the defendant's pocket, the defendant commented, "you got me." Field testing revealed that the envelopes contained cocaine, and the defendant was arrested.

The defendant moved to suppress his statement and the evidence seized following the investigatory stop that occurred on Dodge Avenue in East Haven on September 23, 2005, as the fruits of an illegal stop. After hearing oral argument, on January 26, 2006, the court, in an oral ruling, denied the motions to suppress.[1] On

---

[1] We note that the court carefully considered the motions and delivered a thoughtful and correct oral decision. The court subsequently signed a transcript of its ruling in compliance with Practice Book § 64-1.

the basis of the facts set forth previously, the court concluded that a reasonable and articulable suspicion existed to stop the defendant. Thereafter, the jury found the defendant guilty of both charges. The court sentenced the defendant to five years of incarceration and two years of special parole. This appeal followed.

As an initial matter, we note that our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. As stated by our Supreme Court: "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 92, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

On appeal, the defendant claims that the court improperly concluded that the officers had a reasonable and articulable suspicion of criminal activity to justify the stop, as required by *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).[2] In support of his claim, the defendant argues that the court erroneously concluded that the informant was reliable and that the facts of record as found by the court do not establish that the police had a reasonable and articulable suspicion to stop him.

---

[2] The defendant also claims that there was a violation of his rights under article first, § 7, of the constitution of Connecticut. We review his claim only under the fourth amendment to the United States constitution because the defendant has failed to provide a separate and distinct analysis of his state constitutional claim. See *State* v. *Joyce*, 243 Conn. 282, 288 n.6, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

"Under the fourth amendment to the United States constitution . . . a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 281, 764 A.2d 1251 (2001).

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . *Terry* v. *Ohio*, supra, 392 U.S. 21 . . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 505, 838 A.2d 981 (2004); see also *Illinois* v. *Wardlow*, 528 U.S. 119, 123–24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). "In determining the constitutional validity of an investigatory stop, both the United States Supreme Court and our Supreme Court require a balancing of the nature of the intrusion on personal security against the importance of the government interest inducing that intrusion. *United States* v. *Hensley*, 469 U.S. 221, 228, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985); *State* v. *Mitchell*, 204 Conn. 187, 196–97, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987) . . . ." (Citation omitted.) *State* v. *Pierog*, 33 Conn. App. 107, 111, 634 A.2d 301 (1993), cert. denied, 228 Conn. 920, 636 A.2d 851 (1994).

In the present case, the court based its finding regarding the existence of a reasonable and articulable suspicion on the observations of East Haven police officers and the information supplied to the police by DeMartino. Despite the tip's corroboration by the police, the

defendant first claims that the record does not support the court's conclusion that the informant provided reliable information about the defendant's alleged criminal activity. In particular, the defendant argues that because DeMartino was a first time informant, his reliability should be assessed as if he were an anonymous tipster. We disagree.

First, the informant in this case was not anonymous but rather was someone known to Cari and who had purchased narcotics from the defendant on multiple occasions.[3] Accordingly, despite the defendant's assertion to the contrary, when an informant is known by a police officer personally, a stronger case exists than one in which police officers receive an anonymous tip.[4] See *Adams* v. *Williams*, 407 U.S. 143, 146–47, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); see also *State* v. *Barton*, 219 Conn. 529, 550–51, 594 A.2d 917 (1991) (when identity of informant known, inference of reliability arises because informant could expect adverse consequences if information provided was erroneous). The United States Supreme Court also has observed that "[p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions." *United States* v. *Harris*, 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971).

Moreover, during their surveillance of the defendant, the officers independently observed behavior that reasonably was consistent with criminal activity corroborating the informant's assertion. Our Supreme Court has

---

[3] Cari testified, and the court concluded, that "Cari had always found the informant . . . to be truthful to him."

[4] In the context of deciding whether probable cause exists to support the issuance of a warrant, this court has concluded that information obtained from a first time informant is not inherently unreliable. See *State* v. *Toth*, 29 Conn. App. 843, 853, 618 A.2d 536 ("[w]ere police unable to rely on information obtained from first time informants, they would be deprived of an important resource in their criminal investigations"), cert. denied, 225 Conn. 908, 621 A.2d 291 (1993).

concluded that "[p]olice efforts in verifying information provided by an informant may help . . . verify his or her reliability." (Internal quotation marks omitted.) *State* v. *Sulewski*, 98 Conn. App. 762, 770, 912 A.2d 485 (2006) (information provided by first time informant reliable when police independently verified many allegations), quoting *State* v. *Smith*, 257 Conn. 216, 226, 777 A.2d 182 (2001), on appeal after remand, 94 Conn. App. 188, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006). In the present case, the informant stated that the defendant, whom the police knew had a reputation as being a drug user and courier, would solicit orders for drugs at two East Haven establishments, Michael's Cafe and the Brick House Cafe and, after receiving an order for drugs, would ride his ten speed bicycle directly to a known drug location in New Haven, the Wagon Wheel bar, would purchase narcotics at this location, would conceal these narcotics in his bandana or pocket and carry these narcotics back into East Haven. After conducting surveillance of the defendant, the officers were able to corroborate many of these details. Therefore, on the basis of the foregoing, we conclude that the court's conclusion that the informant was reliable was proper.

The defendant next challenges the propriety of the court's legal conclusion that the facts of record provided a particularized and objective basis giving rise to a reasonable and articulable suspicion for a *Terry* stop. The defendant argues that because the police did not act immediately on the information received from DeMartino and because such information related to a pattern of drug transactions undertaken by the defendant at unspecified times, the tip lacked sufficient specificity, as it did not pertain to "future actions . . . [that are] not easily predicted." (Internal quotation marks omitted.) We disagree.

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture' . . . that must be taken into account when evaluating whether there is reasonable suspicion." (Citations omitted.) *Alabama* v. *White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990).

"In cases in which a police stop is based on an informant's tip, corroboration and reliability are important factors in the totality of the circumstances analysis." *State* v. *Torelli*, 103 Conn. App. 646, 653, 931 A.2d 337 (2007). "[I]nformants do not all fall into neat categories of known or anonymous. Instead, it is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable . . . no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous . . . a significant amount of corroboration will be required. However, when the informant is only partially known (i.e., [informant's] identity and reliability are not verified, but neither is [informant] completely anonymous), a lesser degree of corroboration may be sufficient to establish a reasonable suspicion." Id., quoting *United States* v. *Elmore*, 482 F.3d 172, 181 (2d Cir. 2007).

In this case, the informant's tip identified the defendant, a suspected drug user and courier, and described the locations where he operated, that he would be using

a bicycle to transport the drugs, the establishment that he would ride to for his purchases and the manner in which he transported the narcotics back to his customer. The informant was able to furnish the police with a pattern of the defendant's behavior that the police could confirm to predict accurately the defendant's future behavior, his bicycle trips between Michael's Cafe or the Brick House Cafe in East Haven and the Wagon Wheel bar in New Haven. The officers also were aware that the Wagon Wheel bar was a location in which drugs were sold. Mulhern testified that after arriving at the Wagon Wheel bar, he observed the defendant engage in a hand-to-hand transfer with an unknown male. Shortly thereafter, he observed the defendant mount his bicycle and sit immediately below a second story window, at which point, the window opened and an arm extended out of the window. Mulhern testified that he could not see anything drop from the window; however, he observed the defendant pedaling away from the Wagon Wheel immediately after the window closed. After Mulhern witnessed these events, the police continued their surveillance, and, as predicted by the informant's tip, the officers observed the defendant pedal his bicycle back toward the East Haven town line.[5] Although the informant's tip did not provide the precise timing of the defendant's trip, many aspects of the tip were corroborated by East Haven police officers before they stopped the defendant. Accordingly, we disagree with the defendant's contention that the

---

[5] Citing United States v. Hensley, supra, 469 U.S. 234, for the proposition that "[a] brief stop and detention at the earliest opportunity after the suspicion arose is fully consistent with the principles of the [f]ourth [a]mendment," the defendant argues that the police could not have had a reasonable suspicion that he was engaged in criminal activity because "if the officers truly believed that the defendant had engaged in illegal narcotics transactions at the Wagon Wheel, the officers should have arrested the defendant at that time and not waited until he rode to another location." Hensley is not undermined where, as here, police postpone their detention of the defendant by less than ten minutes to corroborate details set forth in an informant's tip.

tip merely furnished details regarding his innocuous bicycle riding habits. See *State* v. *Days*, 89 Conn. App. 789, 802, 875 A.2d 59 ("[t]he fact that an innocuous explanation for the conduct observed may have existed is of no consequence to our analysis when, as here, there was a reasonable basis for the police to suspect criminal activity"), cert. denied, 275 Conn. 909, 882 A.2d 677 (2005).

The police officers received predictive information as to the defendant's peculiar routine, conducted surveillance to corroborate much of the informant's tip and witnessed the defendant participate in a hand-to-hand transfer that occurred outside an establishment known for its drug related activity, conduct that the officers reasonably believed was consistent with a drug related transaction. We conclude that the officers had a particularized and objective basis for suspecting that the defendant had engaged in criminal activity and that the *Terry* stop in this case was justified by the totality of the circumstances surrounding the defendant's detention.

The judgment is affirmed.

In this opinion the other judges concurred.