STATE OF CONNECTICUT *v.* DWAINE
ARSENIO MILLER
(AC 32092)

Gruendel, Espinosa and Sheldon, Js.

---

Argued April 17—officially released August 14, 2012

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*Susann E. Gill,* supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga,* state's attorney, and *Margaret E. Kelley,* senior assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Dwaine Arsenio Miller, appeals from the judgment of conviction, rendered after a jury trial, of one count of burglary in the

first degree in violation of General Statutes § 53a-101 (a) (3), one count of burglary in the second degree in violation of General Statutes § 53a-102 (a) and one count of larceny in the third degree in violation of General Statutes §§ 53a-119 and 53a-124 (a) (2). He claims that the trial court erred in denying (1) his motion to suppress his videotaped statement to police and (2) his motion to suppress physical evidence[1] police obtained during their investigatory stop of him in violation of his fourth and fifth amendment rights under the federal constitution.[2] We affirm the judgment of the trial court.

In deciding the defendant's motions, the court found the following facts. On the morning of April 26, 2008, shortly after 4 a.m., an individual entered the Lantern Point[3] home of a female Fairfield University student while she slept. The student awoke to find the intruder in her bedroom standing near her. The intruder, who appeared to be male, was wearing light colored pants and a dark hooded jacket with the hood pulled tightly around his face. The student screamed for help, after which the intruder fled the house. The student immediately called the police, who responded promptly to her

[1] Though the defendant claims that all evidence obtained as a result of the investigatory stop should have been suppressed, the defendant's argument relates solely to the search of his car, which produced a laptop computer and black jacket, rather than any statements made by the defendant or identification witnesses. We therefore address only the propriety of the admission of physical evidence. See *Kelib* v. *Connecticut Housing Finance Authority*, 100 Conn. App. 351, 353, 918 A.2d 288 (2007) (claims not adequately briefed deemed abandoned).

[2] Although the defendant cites to our state constitution in his brief, he has not separately briefed his Connecticut constitutional claims. We, therefore, consider his claim under the federal constitution alone. See *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004) ("[a]lthough the defendant's brief adverts to independent rights under the [state] constitution, [when] no such arguments have been briefed . . . they are . . . deemed to have been waived" [internal quotation marks omitted]), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

[3] Lantern Point is an area of Fairfield Beach where many Fairfield University students live during the regular school year. The houses on Lantern Point are situated in close proximity to one another.

residence. When the police arrived, they did not find the intruder in the home. The police officers determined that a white Macintosh laptop computer and charger belonging to the student's roommate were missing from the home. While at the residence, the responding officers heard the dispatcher announce an assistance call to a neighboring home.

The assistance call came on behalf of another female Fairfield University student, living in a nearby house in Lantern Point, who also awoke to find an individual standing near her in her bedroom. The student was able to chase the intruder from her home. This intruder also was wearing a dark hooded jacket and light colored pants.

After the report of the first break-in, Bryan Staffey, a Fairfield police officer, headed in his patrol car toward Lantern Point, which is situated in an area with few access roads. While en route to Lantern Point, Staffey observed a lone car, driven by the defendant, a twenty year old male, traveling at roughly fifteen miles per hour away from the Lantern Point area on Fairfield Beach Road, approximately one-eighth of a mile from the reported burglary. As Staffey approached the car, he directed his spotlight at the driver of the car and noticed that the driver turned his head to stare toward his police car and that the driver was sweating profusely. At this point, Staffey became suspicious that the driver of the car had been involved in the first reported burglary. Staffey then made a U-turn and stopped the defendant. Upon stopping the defendant, who was the sole occupant of the car, Staffey requested to see his license and registration, which he produced. From dispatch, Staffey learned that the intruder had been wearing a black "puffy" jacket. Staffey noticed that the defendant was wearing a black windbreaker. Staffey asked the defendant from where he was coming, and the defendant gave an answer Staffey knew conflicted

with the direction from which he had observed the defendant's car traveling. Staffey then asked the defendant to step out of his car and called for assistance.

During the stop, the defendant consented to a search of the passenger compartment of his car, as well as to a search of the trunk. Officers recovered a black "puffy" jacket and a white Macintosh laptop computer from the trunk of the car. While the defendant was stopped, the officers who had responded to the students' homes brought the students to the scene to determine if they recognized him as the intruder. Although neither student identified the defendant as the intruder, both confirmed that his clothing and physical build were similar to that of the intruder. The first student identified the laptop computer as the one missing from her home. Staffey asked the defendant where he had obtained the laptop computer, to which the defendant first responded that he did not know. The defendant then stated that an unknown, light-skinned man had given it to him after threatening him and demanding his car keys. Subsequently, police arrested the defendant, advised him of his rights and escorted him to the Fairfield police department.

Once at the police department, Staffey again advised the defendant of his rights. Almost three and one-half hours later, at 9 a.m., Detective Kerry Dalling began her interview of the defendant. Dalling prefaced her interview with the defendant by advising him of his rights, for the third time that morning, this time in writing. She gave the defendant a "Waiver of Rights" form[4] and asked that he read aloud the first right

---

[4] The form, titled "Waiver of Rights," includes the following provisions, each of which the defendant initialed before signing: "I have the right to remain silent. . . . If I talk to any police officer anything I say can be used against me. . . . I have the right to consult with a lawyer before I answer any questions and I may have a lawyer with me during questioning. . . . I have the right to have a lawyer appointed for me, if I cannot afford one, before I answer any questions. . . . I know that if I answer questions, I have the right to stop answering at anytime. . . . I may stop answering

described on the form: the right to remain silent. The defendant did so and demonstrated that he understood this right. He also initialed the form indicating that he was waiving his right. Dalling did not request that the defendant read aloud the remaining rights listed on the form. Instead, the defendant silently read those rights, largely related to the right to counsel, as articulated on the form. As he was reading the waiver form, the defendant and Dalling had a colloquy about the defendant retaining a lawyer. During this discussion, Dalling told the defendant that it was his choice whether to speak to her without a lawyer and asked, "I just want to make it very clear. Are we talking?" The defendant then agreed to talk to Dalling and initialed the form, indicating that he waived his rights to silence and to counsel. During the interview that followed, the defendant confessed to entering the home of the first student and taking the laptop computer from her home.

The defendant was charged on October 17, 2008, in a substitute information, with two counts of burglary in the first degree, two counts of burglary in the second degree and one count of larceny in the third degree. On October 23, 2008, the defendant filed motions to suppress the physical evidence obtained by the police during the search of the car, the witness identifications of him and his statements to police. The court held a hearing on those motions, but reserved judgment on the issue of the defendant's statement to Dalling until trial.

In a memorandum of decision dated April 3, 2009, the court thereafter denied the defendant's motion to suppress any physical evidence seized from the defendant's car because it found that the defendant's consent

questions at anytime if I wish to talk with a lawyer and I may have him with me during further questioning. . . . I am willing to answer questions and make a statement knowing that I have these rights. I do not want a lawyer at this time. I know and understand what I am doing. I do this freely and voluntarily and no threats or promises have been made to me."

to the search of his car was voluntary. After concluding that the witness identifications of the defendant were reliable and not unnecessarily suggestive, the court also denied the defendant's motion to suppress these identifications. The court granted in part and denied in part the defendant's motion to suppress his statements to police. As it had determined that Staffey's investigatory stop of the defendant was lawful, the court denied the defendant's motion with respect to the statements he made in response to Staffey's question about the location from which the defendant had been traveling when he was stopped. The court suppressed the defendant's statements made before he was arrested, about how he obtained the laptop and jacket officers found in his trunk, as the court found that these statements were made while the defendant was in custody, but before police had advised him of his rights, in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The court also suppressed the defendant's statements made immediately following his arrest. Finally, the court suppressed statements made by the defendant upon his arrival at the police station, but before his interview with Dalling, finding that although Staffey had advised the defendant of his rights, the state had not shown that the defendant waived his rights voluntarily, knowingly and intelligently.

The court conducted a separate hearing on the defendant's motion to suppress the defendant's videotaped statement to Dalling. In an oral ruling delivered on September 28, 2009, the court denied that motion because it found that the defendant had knowingly and voluntarily waived his rights to silence and to counsel.

After a jury trial, the defendant was convicted of the charges arising out of the first home intrusion: one count of burglary in the first degree, one count of burglary in the second degree and one count of larceny in

the third degree. He was acquitted of the remaining charges related to the second home intrusion. The defendant filed a motion for a new trial, which the court denied. The court rendered judgment in accordance with the jury's verdict and imposed on the defendant a sentence of fifteen years imprisonment, execution suspended after seven years, with five years of probation. This appeal followed.

"As a threshold matter, we set forth the appropriate standard pursuant to which we review a challenge to a trial court's decisions regarding a suppression motion. This involves a two part function . . . . [T]o the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. Where, however, the trial court has drawn conclusions of law, our review is plenary, and we must decide whether those conclusions are legally and logically correct in light of the findings of fact." (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 694, 817 A.2d 76 (2003). "Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights . . . we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

I

We address first the defendant's claim that the court erred in admitting into evidence his videotaped statement to Dalling. The defendant asserts both that he did not knowingly and voluntarily waive his *Miranda*

rights[5] and that his statement was "tainted" by Staffey's *Miranda* violation, which occurred prior to the defendant's arrest. We disagree.

The following additional facts are relevant to the resolution of the defendant's claim that the court improperly admitted into evidence his statement to Dalling. After the defendant was arrested and escorted to the Fairfield police department, he was booked and placed in an interview room. Upon arriving for her 8 a.m. shift, Dalling learned that the defendant had been arrested and that she would be interviewing him. Approximately one hour later, she went to the interview room where the defendant was held and began a conversation with him. This conversation, along with the rest of the defendant's challenged statement to police, was recorded on video.[6] Following this conversation, Dalling

[5] We note that the defendant does not directly challenge the voluntariness of his confession itself, only the validity of his waiver prior to making the confession.

[6] The following is a transcript of the relevant portion of the interview, which the court admitted into evidence:

"[Dalling]: Oh. I'm [Kerry] Dalling, I'm a detective.

"[The Defendant]: All right.

"[Dalling]: Nice to meet you. Sorry for the delay, but I had to get filled in on what was going on last night.

"[The Defendant]: It's your job.

"[Dalling]: I'm still not entirely sure, so I'm hoping that you'll be able to fill in some of the spaces for me. Do you spell it D-w-a-i-n-e? . . .

"[Dalling]: Okay. I know that the officers downstairs read you your *Miranda* rights.

"[The Defendant]: Mm-hmm.

"[Dalling]: I just want to—and I guess that you do want to talk and you do want to kind of explain your side of the story here? . . .

"[The Defendant]: Yeah.

"[Dalling]:—but I just—it's your choice. So, that being said, I know you were read your rights downstairs, so I want you to just read these. Read the first one out loud for me.

"[The Defendant]: I have the right to remain silent.

"[Dalling]: Okay. Do you understand what that means? What does that mean? I know it sounds simple, but I just want to kind of establish that you can read and that you can understand what you read. So, when you read that, I have the right to remain silent, what does that mean to you?

interviewed the defendant, during which he discussed his studies at the University of Bridgeport and ultimately confessed to the first home intrusion and to having taken the laptop that was found in the trunk of his car.

## A

The defendant first claims that the court erred in admitting into evidence his videotaped statement to Dalling. We disagree.

"As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis* v. *Thompkins*, 560 U.S. 370, 385, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). "Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Bell*, 93

"[The Defendant]: I have the right to remain silent. I was just doing it.

"[Dalling]: Exactly, you don't have to talk, right? Okay. So, read each one and initial.

"[The Defendant]: You want me to read this one out loud?

"[Dalling]: No, you can read it to yourself. . . .

"[The Defendant]: How much is—how much is a lawyer going for right now?

"[Dalling]: Well, there's all different kinds. I mean, they're not cheap, but you could also apply for a public defender if—depending on your financial status.

"[The Defendant]: It's not going to help me now, right, I mean—

"[Dalling]: If you understand everything go ahead and sign.

"[The Defendant]: All right.

"[Dalling]: But lawyers are—I mean, sometimes—I mean, I think you can pay—find lawyers that are like 250 an hour; I mean it's expensive, but if—like I said, depending on your financial means you could qualify for a public defender.

"[The Defendant]: I got a family friend that's a lawyer, like, but I think—yeah, go ahead.

"[Dalling]: . . . I just want to make it very clear. Are we talking? Are you going to talk or—

"[The Defendant]: I mean, yeah, I'll let you know what I told them."

Conn. App. 650, 666, 891 A.2d 9, cert. denied, 277 Conn. 933, 896 A.2d 101 (2006). "To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver." (Internal quotation marks omitted.) *State* v. *Ortiz*, 101 Conn. App. 411, 421, 922 A.2d 244, cert. denied, 283 Conn. 911, 928 A.2d 538 (2007). "Factors used to assess the totality of the circumstances include the age of the accused, the extent of his education, evidence concerning advisement of constitutional rights and the length and nature of the interrogation. . . . Although we usually defer to findings made by the trier of fact, such deference is qualified in questions of this nature by the need to examine the record scrupulously to ascertain whether the factual findings were supported by substantial evidence." (Citation omitted.) *State* v. *Sebastian*, 41 Conn. App. 530, 540, 677 A.2d 437, cert. denied, 238 Conn. 906, 679 A.2d 365 (1996).

The totality of the circumstances surrounding the defendant's interactions with the police following his arrest, as gleaned from the record, demonstrates that he validly waived his *Miranda* rights. The police advised the defendant of his rights twice before he met Dalling. Dalling then provided these rights to the defendant in writing. The defendant showed, by reading the first right aloud and articulating how the right could be exercised, that he was capable of reading and understanding written English. See footnote 6 of this opinion. Moreover, the defendant had obtained education beyond high school, similarly indicating that he was able to understand his rights and his decision to waive them. At the time of this interview, the defendant was a twenty year old adult, both legally and practically

capable of comprehending his rights and his waiver of them. Additionally, neither his age nor his level of education made him vulnerable to misunderstanding his rights as presented to him or to being coerced into involuntarily waiving his rights.

Despite initialing and signing the "Waiver of Rights" form, which states that he has the right to consult an attorney at any time, that a lawyer could be appointed to represent him and that he did not want a lawyer at that time, the defendant nevertheless argues that his waiver was not knowing and voluntary because he asked Dalling questions about a lawyer while reading and completing the form.[7] We do not agree.

The defendant's comments to Dalling were related to the cost and utility of obtaining a lawyer.[8] They did

[7] The defendant also argues that once he asked Dalling questions concerning a lawyer, she had the duty to ask clarifying questions before proceeding with the interview. The defendant asserts that this duty arises specifically in the prewaiver context. That is, if a suspect has not yet validly waived his *Miranda* rights and makes an ambiguous reference to a lawyer, the police must not proceed with the interview unless they ask questions to clarify whether the defendant is invoking his right to counsel. Neither the Connecticut courts nor the Supreme Court of the United States has recognized such a duty in the prewaiver context. Moreover, the Supreme Courts of Connecticut and the United States have found no such duty to ask clarifying questions after a suspect has validly waived his right to counsel. *Davis* v. *United States*, 512 U.S. 452, 462, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *State* v. *Hafford*, 252 Conn. 274, 292, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

As the state points out, the Supreme Court of the United States has recently decided, in *Berghuis* v. *Thompkins*, supra, 560 U.S. 370, that once the suspect has been advised of his or her *Miranda* rights, the suspect bears the burden of unambiguously asserting the right to silence, regardless of whether the police have obtained a waiver of rights. In *Berghuis*, the suspect had remained silent for several hours, without having waived his *Miranda* rights, but then made several inculpatory comments to the police. Id., 375–76. Although it could have, on the facts of the case, the court did not recognize a distinction between the prewaiver and postwaiver contexts with respect to *Miranda* rights.

[8] The defendant does not claim that he invoked his fifth amendment right to counsel, but rather argues that the court improperly found that his waiver of this right was valid.

not indicate that the defendant wished not to speak with her without counsel. Nor did these comments indicate that the defendant did not understand his rights, but rather that he was weighing the relative benefits and costs of exercising those rights. Dalling told the defendant that it was his choice whether to speak to her, in addition to this being printed on the "Waiver of Rights" form. Furthermore, after the defendant raised the subject of a lawyer, but before beginning the interview, Dalling asked one final time, "to make it very clear," whether the defendant wanted to speak to her, and he agreed to speak to her without a lawyer present.

The totality of these circumstances show that the defendant validly waived his rights. He was advised of his rights more than once, both orally and in writing. The defendant demonstrated an understanding of his *Miranda* rights and his decision to waive them. He was both adequately educated and old enough to understand his rights and the decision not to exercise them. Additionally, there is no evidence that suggests the defendant did not, in fact, understand his rights. Moreover, the conditions of the defendant's interview were neither harsh nor intimidating. Most telling, the defendant expressly waived his rights in writing and orally. See *State* v. *Chung*, 202 Conn. 39, 50–51, 519 A.2d 1175 (1987) (defendant's express written and oral waiver strong proof that waiver is valid). Thus, we conclude that the court properly found that the defendant voluntarily and knowingly waived his *Miranda* rights.

## B

We turn next to the defendant's argument that his statement to Dalling was inadmissible because it was tainted by Staffey's *Miranda* violation. We conclude that it was not so tainted.

"[E]rrors made by police in administering the prophylactic *Miranda* procedures . . . should not breed the

same irremedial consequences as police infringement of the Fifth Amendment itself . . . [and] the admissibility of any subsequent statement should turn in these circumstances solely on whether it [was] knowingly and voluntarily made." (Citation omitted; internal quotation marks omitted.) *State* v. *Shifflett*, 199 Conn. 718, 740–41, 508 A.2d 748 (1986). "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon* v. *Elstad*, 470 U.S. 298, 314, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). "[T]he finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." Id., 318.

The *Miranda* violation committed by Staffey was neither deliberately coercive nor tactically improper. After the police discovered the laptop computer and black "puffy" jacket in the trunk of the defendant's car, but before the defendant had been placed under arrest, Staffey asked only from where the defendant had obtained these items. There is no evidence, and the defendant does not claim, that the police engaged in any coercive conduct in order to obtain the defendant's statement where he claimed that an unknown light-skinned man had given him the items found in his trunk. As the court established in *Elstad*, "the task of defining custody is a slippery one," and "policemen . . . [cannot realistically be expected to] make no errors whatsoever." (Internal quotation marks omitted.) *Oregon* v.

*Elstad,* supra, 470 U.S. 309. Staffey committed a technical error in determining when the defendant was in custody and, accordingly, was entitled to be advised of his rights. This error does not constitute, however, coercive or compulsive action by the police warranting exclusion of the defendant's subsequent statements to the police, statements that *did* follow proper *Miranda* warnings.

As the *Miranda* violation here was a technical one, where the police made an error in administering the warnings, rather than one of constitutional dimension, we look only at whether the defendant made the statement voluntarily—that is, absent police coercion. The most significant indicator of the voluntariness of the defendant's statement is that he was advised of his rights in three separate instances, and ultimately chose not to exercise these rights. See *State* v. *Gonzalez,* 302 Conn. 287, 303, 25 A.3d 648 (2011) ("[subsequent] careful and thorough administration of *Miranda* warnings serve[s] to cure the condition that rendered the [prior] unwarned statement inadmissible" [internal quotation marks omitted]). Moreover, we do not find that Dalling's responses to the defendant's questions about a lawyer were coercive. Dalling provided factual information about the cost of a lawyer in response to the defendant's inquiries. She reminded the defendant that he could be appointed an attorney, if he qualified financially. Dalling also explicitly told the defendant that whether to speak with her was his choice. Additionally, as the trial court found, Dalling's interview of the defendant "proceed[ed] at a conversational pace," with the defendant remaining unshackled for its entirety and provided with refreshment, conditions that do not indicate that the defendant's statement was coerced, rather than voluntary. On the basis of these circumstances, and the entire course of police conduct, we conclude that the court properly found that the defendant voluntarily made his

statement to Dalling, notwithstanding Staffey's prior *Miranda* violation.

Despite the principle announced in *Elstad*, the defendant argues that his statement should have been excluded nonetheless. Specifically, the defendant asserts that his circumstances fall in line with the exception to *Elstad* detailed in *Missouri* v. *Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). We do not agree.

In *Seibert*, the police questioned, without administering her *Miranda* rights, a woman suspected of involvement in an arson that resulted in the death of a disabled boy. Id., 604–605. After obtaining a confession from the woman, the police advised her of her *Miranda* rights. Id., 605. The detective interviewing her then reminded her of her confession and asked her questions that elicited her confession again. Id. The detective testified at trial that there was a "question first" policy in his department and that he had made a conscious decision to engage in this strategy. Id., 605–606.

The court found that this kind of police tactic undermines the purpose of issuing *Miranda* warnings before subjecting suspects to custodial interrogation, rendering suspects' subsequent statements inadmissible. Id., 613–14. Yet, the court distinguished the "question first" scenario challenged in *Seibert* from the situation in *Elstad*, where police made an error in administering *Miranda* warnings. Id., 615–16. "The contrast between *Elstad* and [*Seibert*] reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity

of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id., 615.

The disparity between the defendant's experience and that of the suspect in *Seibert* is substantial. In *Seibert*, the police intended to undermine the protections of *Miranda*, whereas there is no evidence that the Fairfield police had a similar intent. Moreover, in *Seibert*, the police obtained a confession from the suspect before administering the *Miranda* warnings. In this case, however, the police asked a single question before advising the defendant of his rights, a question that yielded, rather than a confession, a potentially exculpatory explanation for the evidence found in the defendant's trunk.

Further, the suspect in *Seibert* was interviewed continuously by the same detective, in the same place, both before and after the *Miranda* warning. The defendant, however, made his unwarned statement to Staffey at the scene of the traffic stop near Lantern Point, but made the statement in which he confessed to Dalling at the Fairfield police department. Dalling initiated her interview with the defendant, more than three hours after the defendant made his unwarned statement to Staffey, by saying that she was not "entirely sure" of what had transpired that morning, that she needed to "fill in the spaces." Her statement indicates that Dalling's interview was not presented as continuous with Staffey's prewarning question, but rather that it was an interview with the purpose of covering new information. Therefore, we conclude that the defendant's circumstance is different from that addressed by *Seibert*. Accordingly, the defendant's claims are squarely resolved under *Elstad*. Because the defendant knowingly and voluntarily waived his *Miranda* rights before making his statement to Dalling, the police advised the defendant of his rights several times and the police

did not engage in coercive conduct in obtaining his statements, we conclude that the trial court did not err in admitting into evidence the defendant's statement to Dalling.

## II

We turn next to the defendant's claim that the court erred in denying his motion to suppress the physical evidence police obtained from the search of his car. The defendant claims that Staffey's investigatory stop of the defendant was unlawful, thereby tainting his consent to search his car, which rendered the fruits of that search inadmissible.[9] We do not agree.

"Under the fourth amendment to the United States constitution . . . a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. . . . [I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citation omitted; internal quotation marks omitted.) *State* v. *DeMaio*, 107 Conn. App. 462, 468, 945 A.2d 980, cert. denied, 287 Conn. 923, 951 A.2d 574 (2008). "Because a reasonable and articulable suspicion is an objective standard, we focus not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." (Internal

---

[9] The defendant also baldly alleges that the stop was a result of racial profiling by Staffey. He does not, however, offer any analysis of this claim, but merely asserts, that an African-American, being stopped in a predominately Caucasian neighborhood, "raises more than a specter" of racial profiling. We need not review that inadequately briefed claim. See *State* v. *Griggs*, 288 Conn. 116, 123 n.12, 951 A.2d 531 (2008) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]).

quotation marks omitted.) *State* v. *Cyrus*, 297 Conn. 829, 837, 1 A.3d 59 (2010).

"The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness. . . . Proximity in the time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." (Citation omitted; internal quotation marks omitted.) *State* v. *Gregory*, 74 Conn. App. 248, 257–58, 812 A.2d 102 (2002), cert. denied, 262 Conn. 948, 817 A.2d 108 (2003). "[N]ervous, evasive behavior . . . is a pertinent factor in determining reasonable suspicion." (Internal quotation marks omitted.) *State* v. *Benton*, 304 Conn. 838, 851, 43 A.3d 619 (2012). "[P]olice officers may reasonably act upon observation of a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." (Internal quotation marks omitted.) Id., 849.

At the time Staffey made the investigatory stop of the defendant, he had a reasonable suspicion that the defendant had just committed the burglary reported by police dispatch. Although Staffey did not have a full description of the suspect, he did have information regarding the time and place of the incident before stopping the defendant. That information allowed Staffey to draw reasonable inferences from his observations of the defendant. Only minutes after the burglary was announced by dispatch, Staffey observed the defendant's car, one-eighth of a mile from the burglarized home, traveling from the area where the reported burglary had occurred. Additionally, the defendant's car was the only car on the road, in an area that has few routes of egress. The defendant's lone presence, close in temporal and physical proximity to the scene of the

burglary, contributed to the establishment of reasonable suspicion, thereby permitting the police to stop him. The defendant's behavior immediately before Staffey stopped him also supported the court's finding of reasonable suspicion. The court found that Staffey observed that the defendant was sweating profusely.[10] Based on these facts, the court's finding that the stop was justified was reasonable.

The totality of the circumstances, the proximity of the defendant to the home shortly after the burglary, taken together with his observed behavior and demeanor, supported a reasonable suspicion to stop him for investigatory purposes. As we have concluded that the court's determination that Staffey's stop of the defendant was not unlawful, we need not analyze whether it tainted the defendant's consent to the search of his car.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[10] The defendant's sweating is the only factual finding he challenges. Given that the trial court credited Staffey's testimony on this point and that the defendant himself noted that he was sweating when Staffey stopped him, we do not conclude that the trial court's determination was clearly erroneous.