******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RICHARD A.
HOUGHTALING
(AC 35720)

Gruendel, Beach and Alvord, Js.

*Argued November 21, 2014—officially released March 17, 2015*

(Appeal from Superior Court, judicial district of
Windham, geographical area number eleven, Riley, J.)

*David V. DeRosa*, with whom, on the brief, was *Austin B. Johns*, for the appellant (defendant).

*Nancy L. Walker*, deputy assistant state's attorney,
with whom, on the brief, were *Patricia M. Froehlich*,
state's attorney, and *Matthew A. Crockett*, assistant
state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Richard A. Houghtaling, appeals from the judgment of conviction following his conditional plea of nolo contendere[1] to one count of possession of marijuana with intent to sell in violation of General Statutes § 21a-277 (b) and one count of possession of more than four ounces of marijuana in violation of General Statutes § 21a-279 (b). The plea followed the trial court's denial of the defendant's motion to suppress evidence seized from a property the defendant owned, statements made by the defendant and others,[2] and the fruits of the allegedly unlawful search and seizure and unlawfully obtained statement. On appeal, the defendant claims that the court's denial of his motion to suppress was improper because (1) he had a reasonable expectation of privacy in the area searched, including the home and the area surrounding it, (2) his fourth amendment rights were violated by the warrantless search[3] conducted by the statewide narcotics task force, (3) the police lacked a reasonable and articulable suspicion to conduct a motor vehicle stop of the van operated by the defendant and his resulting arrest was unsupported by probable cause, and (4) the defendant's statement given to police was involuntary.

The following facts were found by the court. On August 9, 2010, a marijuana eradication operation was being conducted by the statewide narcotics task force in the northeastern part of the state. The operation included members of the task force positioned in a Massachusetts Air National Guard helicopter and a ground team conducting raids. In the early afternoon, officers in the helicopter observed what they believed to be a large crop of marijuana being grown in the area of 41 Raymond Schoolhouse Road in Canterbury (property). The officers in the helicopter provided the ground team with the coordinates, and the officers in the ground team approached the property. Several officers were on the ground, driving separate, unmarked vehicles. They drove down the narrow, dirt driveway, near which was posted a "no trespassing" sign. The officers stopped in front of an open, steel gate, parked their vehicles, walked toward the house, and knocked at the front door. After no one answered, the officers walked around the side of the home. The officers saw a pool area containing dozens of marijuana plants. They walked toward a greenhouse, which had no side walls. As they approached, they saw two men inside the greenhouse, which contained marijuana plants. The two men, identified as Thomas Phravixay[4] and Sisouk Phravixay, were given *Miranda*[5] warnings. Phravixay indicated to officers that he was renting the home. Shortly thereafter, Phravixay provided written consent to search.

At some point after encountering the two men, officers returned to their vehicles. Matthew Moskowitz, a member of the Bristol Police Department assigned to

the statewide narcotics task force, radioed that a white van had entered the driveway, turned around and left quickly.[6] Moskowitz and Officer Mark Wiener, a member of the state police assigned to the statewide narcotics task force, followed the van and observed it parked on the side of the road. The officers approached the van with their weapons drawn and asked the occupants, later identified as the defendant and William Eichen, the defendant's brother-in-law, why they had turned into the property and then left. The defendant explained that he went to the property to visit a friend, but that he left because he did not recognize the vehicles. The officers then looked into the back of the van and saw lumber and irrigation piping, which they believed to be consistent with the construction of the greenhouse on the property. The defendant and Eichen were then handcuffed and transported to the property, where they were advised of their *Miranda* rights. Although initially reluctant to speak, the defendant gave a statement after the officers provided him with information, including that Phravixay had consented to a search, the evidence the officers had seen so far, that officers had found mail with the defendant's name on it, and that he was "going to jail." The defendant stated that he had purchased the home one year ago and had decided to rent it to Phravixay because he could not afford the mortgage payment. He also said that Phravixay paid him "periodically for the rent," and that he had decided to help Phravixay cultivate marijuana about four or five months ago.

The defendant filed a motion to suppress on July 3, 2012, and the state filed an objection on December 19, 2012. A hearing was held on January 31, 2013, at which the defendant did not testify. The court issued a written memorandum of decision denying the defendant's motion to suppress on March 6, 2013. The defendant subsequently entered a conditional plea of nolo contendere to one count of possession of marijuana with intent to sell and one count of possession of more than four ounces of marijuana, and was sentenced to five years imprisonment, suspended after four years, with five years of probation. This appeal followed.

I

STANDING

The defendant first claims that the court incorrectly determined that he lacked standing to challenge the search of the property.[7] He specifically argues that he had a reasonable expectation of privacy in the property searched such that the warrantless search violated his rights under the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut.[8] We are not persuaded.

Two Part Test

We first set forth the applicable law surrounding

standing to contest an allegedly illegal search. "The touchstone to determining whether a person has standing to contest an allegedly illegal search is whether that person has a reasonable expectation of privacy in the invaded place. *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State* v. *Joyce*, 229 Conn. 10, 20, 639 A.2d 1007 (1994). Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 92, 675 A.2d 866 (1996).

"Furthermore, [t]he defendant bears the burden of establishing the facts necessary to demonstrate a basis for standing . . . and the trial court's finding [on the question of standing] will not be overturned unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Boyd*, 57 Conn. App. 176, 184, 749 A.2d 637, cert. denied, 253 Conn. 912, 754 A.2d 162 (2000); see also *State* v. *Mitchell*, 56 Conn. App. 561, 566, 744 A.2d 927 (defendant has burden of proving that he had reasonable expectation of privacy in premises), cert. denied, 253 Conn. 910, 754 A.2d 162 (2000). "The right of privacy is personal to the party seeking to invoke it, and thus cannot be left to the court's speculation." *State* v. *Michael D.*, 153 Conn. App. 296, 310, 101 A.3d 298, cert. denied, 314 Conn. 951, 103 A.3d 978 (2014).

### Subjective Expectation of Privacy

To evaluate whether a defendant has demonstrated a subjective expectation of privacy in a location, our courts employ the following test: "a defendant must show facts sufficient to create the impression that (1) his relationship with the location was personal in nature, (2) his relationship with the location was more than sporadic, irregular or inconsequential, and (3) he maintained the location and the items within it in a private manner at the time of the search." *State* v. *Boyd*, supra, 57 Conn. App. 185; see also *State* v. *Braswell*, 145 Conn. App. 617, 642, 76 A.3d 231 ("[e]vidence of the defendant's relationship with the location is necessary to establish a reasonable expectation of privacy"), cert. granted on other grounds, 310 Conn. 939, 79 A.3d 892 (2013).

The trial court made several factual findings in

determining that the defendant did not exhibit a subjective expectation of privacy in the property. The court found that Phravixay lived at the property, stored possessions there, and "paid rent periodically" to the defendant. The court found that the defendant neither stored possessions at the property nor lived there, and that he lived approximately two hours away in Danbury. Further, noting that the defendant had not introduced any facts to suggest that the rental agreement had ended at the time of the search, the court concluded that the defendant did not have a reasonable expectation of privacy in the property.

### First *Boyd* Factor

We now consider the defendant's claims under applicable law. The defendant, conceding that "ownership of the property alone does not establish standing," argues that he had a personal relationship with the property. He claims that he was "a co-occupant on the property, and not just an absentee landlord . . . ." First, the defendant argues that he owned the property and leased it to Phravixay for a monthly rent at a rate that was less than his monthly mortgage payment, which he claims suggests cotenancy.[9] Second, he claims that he received and stored items on the premises, but he only mentions an aeration system found at the property but addressed to him in Danbury. Third, he claims that because he received mail at the property, he was there frequently.

Notwithstanding the defendant's arguments, the personal nature of his relationship to the property was not sufficiently developed through the evidence or testimony at the hearing. His arguments on appeal are thus unsupported by the record.

The fact that Phravixay paid monthly rent that was less than the defendant's monthly mortgage payment, without more, provides no support for the claim that the defendant was a cotenant. The defendant did not present evidence indicating in what manner he retained the rights, if at all, to use the premises despite Phravixay's rental of the property.[10] See *State* v. *Brown*, 198 Conn. 348, 358, 503 A.2d 566 (1986) (no evidence presented that defendant's rental of garage included both bays or relative rights of others to use garage or driveway).

With regard to the claim that the defendant received and stored items on the premises, the defendant cites only to an aeration system. The defendant acknowledges that the aeration system was addressed to him in Danbury, but he argues that it was used on the property. Cf. *State* v. *Zindros*, 189 Conn. 228, 240, 456 A.2d 288 (1983) (considering, in determining whether defendant had subjective expectation of privacy in premises, that defendant testified he had personal property inside building which he claimed to be worth more than

$6000), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). Douglas Hall, a sergeant with the statewide narcotics task force, testified that other than the mail found in the kitchen, he could not think of any other personal items within the home that were identifiable to the defendant.

The only evidence adduced at the hearing with regard to mail was Hall's testimony that he believed there was "some mail" in the kitchen with the defendant's name on it, and Moskowitz' testimony that he found mail in the mailbox with the defendant's name on it. The defendant suggests that the officers' observation of the mail shows that he was at the property frequently, but he offered no testimony or evidence to support this contention.

### Second *Boyd* Factor

The defendant additionally argues that his relationship with the property was more than sporadic, irregular or inconsequential. He argues that he "actively participated in home improvement in the enclosed yard surrounding the house," a claim that he supports with only the fact of his possession of "material to repair the greenhouse . . . ."[11] He claims that this shows he was at the property on a regular basis. Additionally, in his reply brief, he claims that "there is as much indication he slept at the property as the Phravixay brothers did."

The defendant's claims that he actively participated in home improvement in the enclosed yard and that the property "was a place he . . . spent time at and possibly slept at" are entirely unsupported by facts in the record.[12] Cf. *State* v. *Kennedy*, 20 Conn. App. 354, 359–60, 567 A.2d 841 (1989) (review of record revealed that defendant, grandson of homeowner, had established expectation of privacy in basement garage, noting factors including that he had made repairs around house), cert. denied, 214 Conn. 805, 573 A.2d 317 (1990).

### Third *Boyd* Factor

The defendant claims that his "considerable efforts to preserve [the] property as private" demonstrate his subjective expectation of privacy in the property. The defendant mentions the "sparsely populated area" in which he purchased the property, the location of the residence on the property, a posted no trespassing sign, and a gate as examples of his efforts to keep the property private. The state contends that "[t]hese attributes do not reveal the defendant's actual expectation of privacy in the property, when he leased it to another person, left no personal possessions there, and resided nearly two hours away." (Emphasis omitted.) We agree with the state.

The relevant inquiry is whether the defendant exhibited a subjective expectation of privacy at the time of the search. The third *Boyd* factor addresses whether

the defendant "maintained the location and the items within it in a private manner at the time of the search." *State* v. *Boyd*, supra, 57 Conn. App. 185; see also *State* v. *Mooney*, 218 Conn. 85, 110, 588 A.2d 145 (resolving question of whether defendant had reasonable expectation of privacy in duffel bag and cardboard box at time of search), cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); *State* v. *Brown*, 129 Conn. App. 552, 557, 19 A.3d 1282 (noting, in determining expectation of privacy, testimony of resident of apartment that "at the time of the search the defendant would stay at her house three to four times a week with her permission"), cert. denied, 302 Conn. 914, 27 A.3d 372 (2011). The defendant did elicit testimony from Hall that he believed a "no trespassing" sign and a gate were located on the property. The defendant's statement to police, however, indicated that shortly after buying the house about one year ago, he could not afford the mortgage and so he began renting the house to Phravixay. Without more, it is unclear when the gate and sign were installed, who installed these two items, and for whose privacy were they installed. Overall, the defendant failed to show how these two features, which he claims were suggestive of an effort to maintain the property as private, were indicative of his own expectation of privacy, rather than the expectation of Phravixay, the resident of the leased premises.[13]

The defendant did not testify at the hearing, and there was no testimony that he had exhibited a subjective expectation of privacy in the property.[14] See *State* v. *Harris*, 122 Conn. App. 521, 527, 3 A.3d 82 (2010) (noting defendant did not testify and conceded that no testimony was presented that he held subjective expectation of privacy in hallway closet); cf. *State* v. *Harris*, 10 Conn. App. 217, 223, 522 A.2d 323, 327 (1987) (noting defendant did not testify but that other testimony indicated that bedroom searched was under exclusive control of defendant, and because it was conceded by state to be defendant's bedroom, defendant had reasonable expectation of privacy there).[15] The defendant called one witness, Master Sergeant Patrick Torneo, who was posted in the helicopter on the day of the search. The defendant did not elicit any testimony from Torneo that could support his burden to show that he had a reasonable expectation of privacy in the area searched.[16] Accordingly, we determine that the court did not err in denying the defendant's motion to suppress the evidence obtained from the search of the property because the defendant failed to establish a reasonable expectation of privacy in the property.[17]

## II

### CLAIMS ARISING FROM MOTOR VEHICLE STOP

The defendant next claims that the motor vehicle stop of the van driven by the defendant and the resulting arrest were unconstitutional.[18] We consider each in turn.

## Motor Vehicle Stop

The defendant claims that the motor vehicle stop was not supported by a reasonable and articulable suspicion that he was engaged in criminal activity.[19] We disagree with the defendant's claim.

We first note "our standard of review of a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 113 Conn. App. 250, 266, 966 A.2d 277, cert. denied, 292 Conn. 901, 971 A.2d 40 (2009).

We next set forth the applicable law surrounding the constitutionality of motor vehicle stops. "Pursuant to *Terry* v. *Ohio*, [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], a police officer has the authority, under the fourth amendment to the United States constitution, to stop the operator of a car if the officer has a reasonable and articulable suspicion that the operator has engaged in illegal conduct. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citation omitted; internal quotation marks omitted.) *State* v. *Ocasio*, 112 Conn. App. 737, 744, 963 A.2d 1109, cert. denied, 292 Conn. 904, 973 A.2d 106 (2009). "What constitutes a reasonable and articulable suspicion depends on the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 113 Conn. App. 260. "On appeal, [t]he determination of whether reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) *State* v. *Arokium*, 143 Conn. App. 419, 428, 71 A.3d 569, cert. denied, 310 Conn. 904, 75 A.3d 31 (2013).

The court denied the defendant's motion to suppress evidence seized from the van, finding that the officers possessed a reasonable and articulable suspicion to conduct a motor vehicle stop. The court credited the

officers' testimony at the hearing and found that "[t]he defendant's flight, coupled with police knowledge that someone entering on the property might be involved in the grow operation, and the defendant's subsequent parking of the van adjacent to the property, furnished a reasonable and articulable basis of suspicion on which officers could, at the very least, question the driver of the vehicle about his presence there."

The defendant argues that merely driving onto the driveway, backing up, and parking on the street cannot be sufficient to establish a reasonable suspicion that he was engaged in criminal activity, and he also points to the lack of evidence that he had committed any traffic violation. "[A]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal." (Internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 10, 997 A.2d 461 (2010); see *State* v. *Lipscomb*, 258 Conn. 68, 71 and n.3, 779 A.2d 88 (2001) (police had reasonable and articulable suspicion to stop motor vehicle despite not observing motor vehicle violation, where officers observed behavior consistent with soliciting prostitute). "We do not consider whether the defendant's conduct possibly was consistent with innocent activity but, rather, whether the rational inferences that can be derived from it reasonably suggest criminal activity to a police officer." *State* v. *Madison*, 116 Conn. App. 327, 336, 976 A.2d 15, cert. denied, 293 Conn. 929, 980 A.2d 916 (2009).

This court has previously upheld the validity of motor vehicle stops where there has been no indication of a motor vehicle violation, but where the surrounding circumstances have justified the stop. In *State* v. *Rice*, 172 Conn. 94, 98–99, 374 A.2d 128 (1976), the court determined that police had a reasonable and articulable suspicion to stop a motor vehicle departing from a driveway, where police were responding to a call reporting a serious crime involving a gun early in the morning when few cars were on the roads.[20] In the present case, Hall testified that by the time the defendant pulled into the driveway, police had already (1) been made aware by the air team that there existed on the property "a whole lot of marijuana right out in the open," (2) viewed the extensive marijuana grow operation occurring on the property, including in the pool area and the partially constructed greenhouse, and (3) encountered the two men who were working inside the greenhouse, one of whom indicated to police that he was tending to marijuana. Hall testified that the police were going to their vehicles to get items in preparation for the search, for which Phravixay had provided consent, when the radio transmission concerning the van occurred. Moskowitz, who observed the van and made the radio transmission, testified that "[w]e believed at that point in time [that the driver] was part

of the investigation."

First, the court did not err in considering the defendant's entering onto the property while the police were investigating the large marijuana grow operation as a factor contributing to reasonable suspicion. "The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness." (Internal quotation marks omitted.) *State* v. *Miller*, 137 Conn. App. 520, 539, 48 A.3d 748, cert. denied, 307 Conn. 914, 54 A.3d 179 (2012). "[P]roximity in time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." (Internal quotation marks omitted.) *State* v. *Hernandez*, 87 Conn. App. 464, 471, 867 A.2d 30, cert. denied, 273 Conn. 920, 871 A.2d 1030 (2005); see also *State* v. *Kimble*, 106 Conn. App. 572, 598, 942 A.2d 527 (noting defendant's "unexplained presence at the scene" in analysis of reasonable and articulable suspicion), cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008). The defendant himself notes that "the aerial photographs entered into evidence . . . demonstrate that this was an isolated property . . . ." It was thus reasonable for the court to consider the defendant's presence at the isolated property, which was the site of a large marijuana grow operation, as a factor in the reasonable suspicion analysis.

Second, the defendant's actions in backing out of the driveway and leaving quickly were considered properly by the trial court as contributing to a reasonable and articulable suspicion that the defendant may have been involved in criminal activity. "[R]eviewing courts . . . must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. . . . This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (Citation omitted; internal quotation marks omitted.) *United States* v. *Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750–51, 151 L. Ed. 2d 740 (2002). The court recognized that "multiple officers testified about the expedited manner in which the work van departed." Moreover, the officer's explanation as to why leaving the property quickly would arouse police suspicion was drawn from his training and experience. Moskowitz testified that "[b]ecause of our training and experience with the way people typically are affiliated with these organizations, if they see things that are not in [the] order in which they left them, they will typically err on the side of safety and flee the area believing that law enforcement has caught onto their business." It is inaccurate for the defendant to argue that the officer

"articulated no inferences of deductions from his training and experience to justify a stop . . . ."

Regarding the defendant's contention that he "was not fleeing at the time of the stop," we do not find the court's consideration of the manner in which the defendant departed the property clearly erroneous.[21] The court's finding that the defendant fled had adequate support in Moskowitz' testimony. Moskowitz testified that he "noticed the white van pull in the driveway and then immediately back out and start to flee the area." When asked to characterize the manner in which the van departed the driveway, he said, "[v]ery quickly." Hall additionally testified that "it came across the radio that a van had pulled into the driveway and was hightailing it out of there, was pretty much how they put it." "[U]nprovoked flight upon noticing the police" may properly be considered as a factor contributing to a reasonable and articulable suspicion of criminal behavior. *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. . . . But unprovoked flight . . . by its very nature, is not 'going about one's business'; in fact, it is just the opposite." (Citations omitted.) Id., 125. In addition to outright flight, "[n]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. . . . Furthermore, when an individual suddenly changes his course of conduct upon seeing the police, such conduct tends to support a reasonable suspicion that the individual may be involved in criminal activity." (Citation omitted; internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 324, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005).[22]

In addition to observing the defendant quickly leave the property, the officers, when they left to try to locate the van, discovered it about one-tenth of a mile down the road, parked "facing back toward the residence as if it had turned around." Having heard testimony that the defendant pulled into a property used for a significant marijuana grow operation, in a location that the defendant himself characterized as "a sparsely populated area of the state," backed out of the driveway and left quickly upon noticing the police,[23] presumably turned around, and parked one-tenth of a mile down the road facing back toward the property from which he had just departed quickly, it was not clearly erroneous for the court to have determined that police reasonably could have concluded that the defendant was not merely going about his business, but that he was indeed engaged in evasive behavior that could rise to the level of flight.

We recognize that this case presents a close question as to whether a reasonable and articulable suspicion

existed that the driver had engaged in criminal conduct. We find it significant, however, that the officers were engaged in the investigation of an evident ongoing felony at the time they conducted an investigatory stop of the van so that there was a direct and immediate spatial and temporal link between the apparent felony and the defendant's presence in the van. The investigation of this evident felony in progress leads us to conclude that the situation presented is distinguishable from those cases in which it has been determined that the police lacked a reasonable and articulable suspicion. For example, in *State* v. *Peterson*, 153 Conn. App. 358, 376, 101 A.3d 337, cert. granted, 314 Conn. 947, 103 A.3d 980 (2014),[24] this court determined that police lacked reasonable suspicion despite the defendant's presence at the home of a suspected drug dealer, reliable information that the defendant was engaged in the sale of marijuana, and observation of the defendant on a previous occasion engaging in behavior that was consistent with drug sales. We noted that "any suspicion of *ongoing* crime was necessarily founded in conjecture or the police's subjective notions of the defendant's propensity to engage in criminal behavior." (Emphasis added.) Id.

In *State* v. *Oquendo*, 223 Conn. 635, 641, 613 A.2d 1300 (1992), our Supreme Court determined that police lacked a reasonable suspicion to stop a man carrying a duffel bag and wearing a thick jacket on a warm night, which an officer stated that burglars often wear to protect themselves when breaking windows. The court noted that "[a]lthough burglaries had been reported in the general area . . . [the officer] had not received any report that a burglary had been committed in that area on the evening of [the stop]." Id., 655; see also *State* v. *Milotte*, 95 Conn. App. 616, 622–23, 897 A.2d 683 (2006) (noting that "[t]here were no recent reports of crimes in the area, and [the officer] knew that the vehicle and its owner were not wanted by the authorities," in determining that officer lacked reasonable suspicion to stop defendant mainly on basis of her belief he was trying to avoid her because of time of day and fact that he traveled on streets and made stops at locations with which she believed he had no connection), appeal dismissed, 281 Conn. 612, 917 A.2d 25 (2007). In *State* v. *Donahue*, 251 Conn. 636, 646–47, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), the court deemed unpersuasive the state's argument justifying a stop on the basis of an increase in crime in the area, among other factors, including driving in a deserted area late at night and making an abrupt turn into an empty, unlit parking lot of a closed business.

We understand the facts in the present case to provide a more compelling argument that the officers possessed a reasonable suspicion than the facts in our precedent concluding otherwise. We consider the facts of this case

to be more in line with those precedential decisions where our standards for reasonable suspicion were satisfied, including *State* v. *Januszewski*, 182 Conn. 142, 149, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), in which our Supreme Court upheld the determination that police possessed a reasonable suspicion to conduct an investigatory stop after observing two persons in the front seat of an automobile parked in a commuter parking lot during the day and where the occupants exhibited plainly furtive conduct as an officer approached.

Considering the totality of the circumstances, we agree with the court that the stop of the van was supported by a reasonable and articulable suspicion that the defendant was engaged in criminal activity.

### Probable Cause to Arrest

The defendant argues that even if the initial stop was justified, the police lacked probable cause to arrest him.[25] In support of his argument, the defendant claims that "[Moskowitz, one of the arresting officers] had not been to the greenhouse in the initial sweep." He thus argues that "Officer Moskowitz never discovered anything based on his personal knowledge to justify detaining [the defendant]."

"On appeal, a court's factual findings underlying its probable cause determination are subject to review under the clearly erroneous standard. . . . We accord plenary review, however, to the determination that the facts as found amount to probable cause." (Citation omitted.) *State* v. *Robinson*, 105 Conn. App. 179, 191, 937 A.2d 717 (2008), aff'd, 290 Conn. 381, 963 A.2d 59 (2009). "However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Arline*, 74 Conn. App. 693, 699–700, 813 A.2d 153, cert. denied, 263 Conn. 907, 819 A.2d 841 (2003).

"A police officer may arrest a person without a warrant when the officer has probable cause to believe that the person has committed or is committing a felony. . . . The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is made pursuant to a totality of circumstances test. . . . With respect to warrantless arrests . . . the trial court, in determining whether the arrest is supported by probable cause, is required to make a practical, nontechnical decision whether, under all the circumstances . . . there is a fair probability that the defendant had committed or was committing a felony. . . . Moreover, it is also important to note that [t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less

than that required for conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Thomas*, 98 Conn. App. 542, 554, 909 A.2d 969 (2006), cert. denied, 281 Conn. 910, 916 A.2d 53 (2007). "Actions and things observed by an experienced law enforcement officer may have more significance to him in determining whether the law is being violated at a given time and place than they would have to a layman . . . and such experience is entitled to at least some weight on the ultimate question of probable cause." (Internal quotation marks omitted.) Id., 555.

The court credited the officers' testimony that after stopping the vehicle, they asked the defendant why he had been to the home and that he provided evasive answers, claiming "to be visiting a friend, but did not name him." The contents of the van, including materials Moskowitz identified as lumber and irrigation piping, were visible to the officers. The court concluded that "[i]n the present case, the materials in the back of the van, which were in plain view, connected the defendant and Eichen to the grow operation. Although the incriminating character of the lumber and piping is not immediately apparent in a vacuum, they were observed by Moskowitz, who was familiar with the grow operation at the home. At that time, officers had probable cause to arrest the defendant."

The defendant challenges the court's finding of probable cause by arguing that "Moskowitz indicated that he had never seen the greenhouse until after [the defendant] was in custody" and, thus, could not have connected the lumber and irrigation piping in the van with the construction of the greenhouse on the property. A review of Moskowitz' testimony reveals that he had not been inside the greenhouse before he brought the defendant back to the property, but Moskowitz never indicated that he had not seen the greenhouse. Moskowitz testified that he had been behind the house prior to pulling over the van. He also testified that he was returning to his vehicle to obtain paperwork to present to Sisouk Phravixay and Thomas Phravixay. It is undisputed that the greenhouse was visible from the rear of the house, the two men initially were encountered in the vicinity of the greenhouse, and the greenhouse structure had no side walls. Moreover, Moskowitz testified that while he had the defendant pulled over: "I observed tubing and construction equipment similar to the tubing and construction equipment that was in the rear of the house where the greenhouse was being constructed. We had asked him why he was leaving the area; he said he was going to visit a friend and didn't understand why police were at the house, so he left. We began to question him as to why he had the construction equipment similar to the greenhouse equipment in his van then."[26]

Accordingly, we conclude that the record supports

the inference that Moskowitz saw the lumber and irrigation piping in the area of the greenhouse prior to conducting the stop of the van. The court's factual finding, based on the evidence and reasonable inferences drawn therefrom, was not clearly erroneous. See *State* v. *Days*, 89 Conn. App. 789, 797, 875 A.2d 59 (court's finding was supported by evidence and reasonable inferences drawn therefrom), cert. denied, 275 Conn. 909, 882 A.2d 677 (2005).[27]

The record supports the inference that Moskowitz saw the lumber and irrigation piping on the property outside the greenhouse prior to conducting the investigatory stop of the van. Moskowitz' testimony established that he "noticed the white van pull in the driveway and then immediately back out and start to flee the area." Those observations having been demonstrated by the record, we must now consider whether the facts amounted to probable cause to believe that the defendant had committed or was committing a felony. The officers' testimony established that the defendant provided evasive answers as to why he had been to the property and left quickly. Their testimony further established that the van the defendant was operating contained lumber and irrigation piping, which was consistent with the materials observed on the property that were being used in the construction of the greenhouse that housed components integral to the marijuana grow operation. The defendant's possession of these construction materials viewed in light of the totality of the circumstances supported the belief that the defendant was involved in a drug related felony, specifically, the marijuana cultivation occurring at the property. See *State* v. *Holloman*, 20 Conn. App. 521, 527–28, 568 A.2d 1052 (items discovered in vehicle together with fact that defendant matched description established probable cause to believe that defendant was person who had robbed liquor store), cert. denied, 214 Conn. 805, 573 A.2d 317 (1990).

We thus conclude that the facts established a sufficient nexus between the defendant and the marijuana cultivation occurring at the property to establish probable cause for his arrest.

## III

### STATEMENT MADE TO POLICE

Last, the defendant argues that the court erred in failing to suppress the statement he gave to police. The defendant first challenges the factual finding of the court that he was advised of his *Miranda* rights.[28] The defendant additionally contends that even if he had been advised of his rights, (1) he did not waive his *Miranda* rights and (2) his statement "was not a product of a free and unconstrained choice . . . ."

We note our standard of review. "The trial court's findings as to the circumstances surrounding [a] defen-

dant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . On the ultimate issue of voluntariness, however, we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Linarte*, 107 Conn. App. 93, 106, 944 A.2d 369, cert. denied, 289 Conn. 901, 957 A.2d 873 (2008).

### Advisement of *Miranda* Rights

We first consider the defendant's challenge to the timing of the advisement of rights. The defendant claims that the "police did not demonstrate that they gave as required by *Miranda* the warning prior to questioning him." The court found that "[t]he state . . . produced evidence from several officers that the defendant . . . received [his] rights shortly after being brought back to the home. Within the course of twenty-five minutes, the defendant signed a notice and waiver of rights form . . . a form consenting to the search and examination of evidence in the home and his vehicle . . . and signed a written statement . . . ." (Citations omitted.) The court further noted that "[t]he prosecution has carried its burden. The defendant was advised of his rights."

The defendant argues that Wiener "could not indicate how long they had talked prior to taking the [defendant's] statement" and that his testimony is evidence that the defendant was not advised of his *Miranda* rights prior to questioning. Wiener testified that he read the defendant his *Miranda* rights at 3:55 p.m. and that he began taking the defendant's statement at 4 p.m. Wiener further testified that he was "not sure how long we spoke for before I actually degraded it to paper." Wiener's testimony can properly be viewed as stating that he was not sure how many minutes transpired, after the defendant began his statement at 4 p.m., before he began to memorialize the defendant's words on paper. This understanding is entirely consistent with Wiener's testimony that "I read him his rights. . . . And then I went over the incident and I asked for his side of the story after a little bit of conversation, and then he provided me his side of the story and I put it on paper . . . ." Accordingly, we conclude that the court's determination that the defendant was advised of his rights is not clearly erroneous.

This conclusion is supported by evidence in the record. In addition to Wiener's testimony, Moskowitz testified that "[w]e verbally read [his rights] to him prior to questioning, and I believe that was at the residence following us placing him in handcuffs." The court did not err in crediting the officers' uncontroverted testimony. See *State* v. *Cabral*, 275 Conn. 514, 532, 881 A.2d 247 (agreeing that evidence adduced at hearing on motion to suppress supported court's determination that defendant was advised of *Miranda* rights prior

to speaking to police, where officer testified without contradiction that he had so warned defendant), cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005); *State* v. *Ortiz*, 101 Conn. App. 411, 423, 922 A.2d 244 (court's "factual findings were based on direct testimony from the officers at the hearing that they had advised the defendant of his rights, which the court found credible"), cert. denied, 283 Conn. 911, 928 A.2d 538 (2007).

### Waiver of *Miranda* Rights

Having concluded that the court properly determined that the defendant was advised of his rights prior to giving his statement, we next consider the defendant's claim that he did not waive his right to remain silent. We note at the outset of our discussion that the defendant's claim is narrowly drawn. With regard to the waiver issue, he claims that the police did not obtain a "specific" waiver of his rights.[29]

The defendant claims that "it appears that the police never did obtain a specific waiver, either orally or [in] writing, of [the defendant's] *Miranda* rights." "To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver." (Citation omitted; internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 266, 288, 897 A.2d 554 (2006). "Although we usually defer to findings made by the trier of fact, such deference is qualified in questions of this nature by the need to examine the record scrupulously to ascertain whether the factual findings were supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Miller*, supra, 137 Conn. App. 531. "[A]fter giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights. . . . [A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis* v. *Thompkins*, 560 U.S. 370, 388–89, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

The defendant argues that his failure to initial the bottom portion of the notice and waiver of rights form indicates that he did not *waive* his *Miranda* rights.[30] Declining to initial the statements, however, does not automatically render the *Miranda* waiver invalid. "[Although a] defendant's express written and oral waiver is strong proof that the waiver is valid . . . the failure to sign a form or give a written statement does not necessarily indicate an involuntary waiver." (Citation omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 74 Conn. App. 580, 586, 814 A.2d 384, cert.

denied, 263 Conn. 915, 821 A.2d 771 (2003); id., 587 (defendant initialed form but refused to sign it); see also *State* v. *Shifflett*, 199 Conn. 718, 732–33, 508 A.2d 748 (1986) (defendant waived right to remain silent by making oral statements despite express refusal to sign waiver portion of form).

The totality of the circumstances surrounding the defendant's waiver of his right to remain silent supports the finding that the waiver was valid. The defendant was advised of his rights, as evidenced by Wiener's testimony that he read the defendant his *Miranda* rights directly from the notice and waiver of rights form and that the defendant signed the form, indicating that he had been advised of his rights. Wiener testified that he then interviewed the defendant and transcribed the defendant's statement onto a written statement form. The statement admitted the defendant's involvement in the grow operation. Wiener went over the warning contained on the top of the form, which states that the signer "make[s] the following statement, without fear, threat, or promise." Wiener testified that the defendant was given an opportunity to review the statement before signing the form. The defendant then signed the form. Wiener testified that although the defendant was reluctant to speak at first, at no time did the defendant give any indication that he did not want to speak to him or ask for a lawyer.[31]

### Voluntariness of Statement

Finally, the defendant argues that police overbore his will to resist, including by making comments that coerced him to respond. We disagree and conclude that the court properly determined that his statement was voluntary.

"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate question of whether a defendant's will has been overborne, thus resulting in an involuntary statement in a particular case, involves, as noted, an assessment of the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (Citation omitted; internal quotation marks omitted.) *State* v. *Stephenson*, 99 Conn. App. 591, 596–97, 915 A.2d 327, cert. denied, 282 Conn. 903, 919 A.2d 1037 (2007).

The defendant claims that his statement was involuntary based on the testimony of Wiener and Hall, which he argues suggests coercion. Wiener testified that he "asked [the defendant] for his side. Basically, like, 'This is what we have here: you're the homeowner, you

denied it, we had to chase you up the street to get you to stop and now it's up. I mean, we, you know, one way or the other you're going to jail. You can have your side on paper or not. It's up to you.' And he did—he was cooperative at that point."[32] The court considered these statements and concluded that "[t]he statements by police . . . were mere investigative tactics and were insufficient to overbear the defendant's will."

"[S]tatements by the police designed to lead a suspect to believe that the case against him is strong are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Doyle*, 104 Conn. App. 4, 17, 931 A.2d 393, cert. denied, 284 Conn. 935, 935 A.2d 152 (2007); see also *State* v. *Reyes*, 81 Conn. App. 612, 617, 841 A.2d 237 (2004) (upholding determination defendant's statement was voluntary, finding officer's statement to defendant that "[he] better tell the truth or [he] was going to do a lot of time in jail" was not coercive). Accordingly, we agree with the court that the evidence presented indicated that the officers' conduct was not sufficient to overbear the defendant's will.

Having concluded that the statements of Hall and Wiener did not render the defendant's statement involuntary, we briefly note that the surrounding circumstances support the determination that the statement was voluntarily given. The defendant does not offer any other circumstances of the interrogation or characteristics of himself that would encourage a finding that his statement was involuntary.[33] The defendant was not detained for any significant period of time before being interrogated, as the court found that the defendant received his rights "shortly after being brought back to the home." The interrogation itself was relatively short in duration, with the court noting that the defendant signed the notice and waiver of rights form, a form consenting to the search of the home and his vehicle, and a written statement, all within twenty-five minutes. See *State* v. *Bell*, 93 Conn. App. 650, 667, 891 A.2d 9 (2006) (detention for six hours before interview lasting one and one-half hours not sufficient to render statement involuntary). Moreover, testimony indicated that the defendant was given an opportunity to review the statement before he signed it. On the basis of our review of the totality of the circumstances, we conclude that the court properly determined that the defendant's statement was a product of his own free will.

Accordingly, we reject the defendant's claim that the court erred in denying his motion to suppress the statement he made to police.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant's plea was conditioned on his right to appeal from the

denial of his motion to suppress evidence in accordance with General Statutes § 54-94a.

[2] The defendant contends for the first time in his reply brief that the court improperly denied his motion to suppress the statements of Thomas Phravixay. "It is well established . . . that [an appellate] court will not review claims that are raised for the first time in a reply brief." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 181 n.52, 84 A.3d 840 (2014). Accordingly, we deem this claim waived.

[3] See footnote 17 of this opinion.

[4] As the trial court noted, the relevant facts and analysis concern Thomas Phravixay, not Sisouk Phravixay. Thus, references in this opinion to Phravixay refer to Thomas Phravixay only.

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] Although the court indicated that someone positioned in the helicopter had radioed this information to the ground team, it is undisputed that Moskowitz radioed the information.

[7] The trial court and the defendant use the term "standing." We observe that "[c]ourts have questioned whether it serves any useful analytical purpose to consider [the] principle [that fourth amendment rights are personal] a matter of standing, distinct from the merits of a defendant's [f]ourth [a]mendment claim . . . [and have concluded] that the definition of [fourth amendment] rights is more properly placed within the purview of substantive [f]ourth [a]mendment law than within that of standing." (Internal quotation marks omitted.) *State* v. *Kimble*, 106 Conn. App. 572, 581, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008); see also *Rakas* v. *Illinois*, 439 U.S. 128, 138–40, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). We note that "[t]he inquiry under either approach is the same." *Rakas* v. *Illinois*, supra, 139. Because the defendant frames his claims in terms of standing, we also use that language.

[8] The defendant does not set forth a separate claim, accompanied by an independent analysis, under the Connecticut constitution. In his appellate brief, the defendant claims that the Connecticut constitution provides similar protection. We, therefore, do not address this claim separately. See *State* v. *Fields*, 265 Conn. 184, 190 n.8, 827 A.2d 690 (2003) ("We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." [Internal quotation marks omitted.]).

[9] The defendant additionally claims that the fact that the officers asked him for consent to search the property indicates that the officers themselves believed that he had an expectation of privacy in the property. Douglas Hall, a sergeant with the statewide narcotics task force, testified that after they found out that the defendant owned the home, "at that point, even though it really wasn't necessary in doing so, we ended up obtaining a consent to search from him as well." Thus, we cannot conclude from the officer's testimony that the police believed that the defendant had an expectation of privacy in the home.

[10] We note that the court considered both the fact that the defendant owned the property and that he rented it to Phravixay in concluding that even if the defendant had exhibited a subjective expectation of privacy in the property, it is not one that society is willing to recognize as reasonable on the basis of the statutory rights of tenants. See General Statutes § 47a-16 (restricting circumstances under which landlord may enter dwelling unit rented to tenant). Because we agree with the court's conclusion that the defendant did not establish a subjective expectation of privacy in the property, we need not reach the question of whether the expectation of privacy is one that society would deem reasonable.

[11] The defendant additionally argues that his "comments made in an admission to the police, and on which the prosecution relies to inculpate him . . . amount to an evident expectation of privacy in the property." We observe that "[p]rivacy expectations do not hinge on the nature of defendant's activities—innocent or criminal." *United States* v. *Fields*, 113 F.3d 313, 321 (2d Cir.), cert. denied, 522 U.S. 976, 118 S. Ct. 434, 139 L. Ed. 2d 334 (1997); id., 320 (defendant possessed reasonable expectation of privacy in apartment where he prepared crack cocaine for resale, because even though he did not live there or stay overnight there, "[h]e had a key . . . paid $125 per week for the privilege of using the apartment, made use of

it on 40 or 50 occasions, could bring guests and, with minor restrictions, could come and go as he pleased, even if [the resident] was not present"). Although the defendant in this case did admit to "help[ing] Tom [Phravixay] cultivate the marijuana," he also stated that he "didn't realize the extent of the grow operation" and "didn't really think much of what was going on at the house . . . ." Without more, his statement is insufficient to establish a subjective expectation of privacy.

[12] Moskowitz testified: "[T]he subject that we had detained on the property had said that he was renting the home from the homeowner, who he pointed out when we brought [the defendant] onto the property and said: That's him; he owns the house." There was no evidence presented as to the amount of time the defendant spent at the property, nor was there any evidence presented that he had slept at the property. Moreover, there was testimony of only one, small bed in the house and that one of the two men first encountered in the greenhouse "indicated that he was the person that resided there . . . ."

[13] The defendant argues that "[w]hether he was active in keeping the property private from people from the road or whether he purchased a property that was made private by a previous owner, the effect is the same on the expectation of privacy." He further argues that "there is no evidence that the tenants did anything to make the property as private as the [task force] found it when they entered the property . . . ." These arguments prove unavailing in light of our case law holding that it is the defendant's burden to prove that he had a reasonable expectation of privacy in the property searched, rather than the state's burden to prove otherwise. *State* v. *Mitchell*, supra, 56 Conn. App. 566.

[14] The defendant relies heavily on *State* v. *Zindros*, supra, 189 Conn. 246–47, and *United States* v. *Botsch*, 364 F.2d 542, 543 (2d Cir. 1966), cert. denied, 386 U.S. 937, 87 S. Ct. 959, 17 L. Ed. 2d 810 (1967), to support his argument that he had a reasonable expectation of privacy in the property searched. The defendant's argument with respect to these cases conflates the analysis applicable to whether an individual possesses the authority to consent to a search of an area with the analysis applicable to whether a defendant possesses a reasonable expectation of privacy in an area. It is not necessary for a court to reach the validity of consent unless the defendant has established that he possessed a reasonable expectation of privacy in the area searched. See *State* v. *Zindros*, supra, 244 ("[t]he state recognizes that if it is found that the defendant had a reasonable expectation of privacy, it must prove that the consenting party possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected" [internal quotation marks omitted.]).

[15] The defendant finally argues that "it is good policy to find standing to curb unlawful and counterproductive police actions." We note that the United States Supreme Court has explained that "since the exclusionary rule is an attempt to effectuate the guarantees of the [f]ourth [a]mendment . . . it is proper to permit only defendants whose [f]ourth [a]mendment rights have been violated to benefit from the rule's protections." (Citation omitted.) *Rakas* v. *Illinois*, supra, 439 U.S. 134; see also *State* v. *Jevarjian*, 307 Conn. 559, 566, 58 A.3d 243 (2012) ("the application of the exclusionary rule, a remedial measure intended to protect against fourth amendment violations, would be inappropriate in the absence of a showing of some such infringement of the defendant's own fourth amendment rights").

[16] The defendant noted that he intended to call another officer who did not respond to his subpoena, but he stated that he intended to question him on an unrelated matter.

[17] Because we determine that the defendant did not establish that he had a reasonable expectation of privacy in the property such that he could contest the search, we do not address his argument that the greenhouse was part of the curtilage and that the warrantless search did not fit under any exception to the warrant requirement. In *State* v. *Brown*, supra, 198 Conn. 359 n.9, our Supreme Court determined that the defendant's claim that a garage was part of the curtilage and thus protected by the fourth amendment failed because the court already had determined that the defendant did not possess a reasonable expectation of privacy in the garage. "The common law concept of curtilage . . . does not provide a separate basis for fourth amendment protection. It simply refers to areas immediately surrounding the home in which expectations of privacy are normally the greatest. . . . The focus remains the reasonable expectation of privacy which an individual possesses in the area. Our finding that the defendant failed to establish that he had a reasonable expectation of privacy in the

garage defeats his claim regardless of how it is labeled." Id.

[18] The defendant cites to *State* v. *Lamme*, 216 Conn. 172, 579 A.2d 484 (1990), a case in which our Supreme Court interpreted article first, § 9, of the Connecticut constitution. Because the defendant does not set forth a separate claim, accompanied by an independent analysis, under the Connecticut constitution, we do not address this claim separately. See footnote 8 of this opinion.

[19] "When considering the validity of a [stop pursuant to *Terry* v. *Ohio*, [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 121 Conn. App. 250, 255, 994 A.2d 691, cert. denied, 297 Conn. 918, 996 A.2d 278 (2010). Because neither party appears to challenge the court's finding that "the defendant was seized for *Terry* purposes when the officers blocked the defendant's vehicle with their car and approached with guns drawn," we consider whether the officers possessed a reasonable and articulable suspicion at that time.

[20] In another case, *State* v. *McMullen*, 2 Conn. App. 537, 541–42, 480 A.2d 594 (1984), the defendant's vehicle was the only car on the street after midnight, heading in the direction away from the location toward which police were traveling to respond to a silent alarm. This court, despite concluding that "there was nothing suspicious about the vehicle," stated that "significant facts, and deductions therefrom, implicated it in a less direct manner." Id., 542. The *Rice* and *McMullen* courts recognized that the circumstances presented in those cases were different from cases involving motor vehicle stops conducted on the basis of "peculiarities in [the vehicle's] operation"; id., 541–42; "a course of patently suspicious behavior" by the defendant, or where the defendant had been "singled out by an informant . . . ." *State* v. *Rice*, supra, 172 Conn. 98. Both courts, however, determined that the surrounding circumstances rendered the stop reasonable.

[21] This argument regarding lack of flight appears to be the defendant's only challenge to the court's factual findings underlying its determination that police possessed a reasonable and articulable suspicion. Pursuant to our standard of review, we consider whether this factual finding is clearly erroneous.

[22] Even if not rising to the level of flight, the behavior could still properly be considered in the reasonable suspicion analysis as evasive behavior. In *State* v. *Benton*, 304 Conn. 838, 851, 43 A.3d 619 (2012), our Supreme Court considered a defendant's challenge as to whether his behavior of uttering an expletive, standing on his pedals to accelerate, and veering his bicycle in a different direction when uniformed police officers stepped into the roadway could be a proper factor in the reasonable suspicion analysis. The defendant argued that "his act of veering was an ambiguous response to police presence and could reasonably be construed as an innocent maneuver required to avoid the physical obstacle posed by the police." Id., 850. The court considered that these behaviors "could, at the very least, be reasonably construed as nervous, evasive behavior, which is a pertinent factor in determining reasonable suspicion." (Internal quotation marks omitted.) Id., 851. The court concluded that these behaviors when combined with the knowledge that "the defendant's companions unambiguously reversed direction and rode away upon spotting the police officers"; id.; made it "objectively reasonable for the officers to conclude that the defendant was fleeing from them . . . ." Id., 852; cf. *State* v. *Hammond*, 257 Conn. 610, 625, 778 A.2d 108 (2001) (no flight where defendant simply walked away from approaching police).

[23] It is not unreasonable to infer that the defendant recognized the unusual presence at the secluded property as law enforcement, as supported by the court's notation in its memorandum of decision that "[t]here were numerous cars in the driveway, and police officers were wearing protective vests emblazoned with the letters of their respective enforcement organizations."

[24] Our Supreme Court has granted review in *Peterson* and will consider: "Did the Appellate Court properly determine that the totality of the circumstances did not provide sufficient reasonable and articulable suspicion for police to detain the defendant?" *State* v. *Peterson*, 314 Conn. 947, 103 A.3d 980 (2014).

[25] The defendant further argues that the "arrest of the [defendant] was

without probable cause that was untainted by an illegal search . . . ." To the extent that the defendant challenges his arrest as unsupported by probable cause on the basis of his argument that the knowledge of the lumber and irrigation piping was gained by way of an illegal warrantless search of the property, his claim is defeated by the determination previously made that he did not have a reasonable expectation of privacy in the area searched. "[T]he Supreme Court has long held that a reasonable expectation of privacy in the subject of a search is a prerequisite for fourth amendment protection." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 278 Conn. 341, 348–49, 898 A.2d 149 (2006); see *State* v. *Pierre*, 139 Conn. App. 116, 128–29, 54 A.3d 1060 (2012) (declining to address defendant's claim that statement should be suppressed as "fruit of the poisonous tree," where defendant did not have reasonable expectation of privacy in area searched and thus could not challenge as fruit of poisonous tree statement made after police discovered gun and marijuana), aff'd, 311 Conn. 507, 88 A.3d 489 (2014); see also footnote 14 of this opinion.

[26] This testimony by Moskowitz was supported by Hall's testimony, in which he stated that the officers conducting the investigatory stop of the van "recognized materials inside the—from looking in the van, that clearly looked like the same materials which were being used to construct the greenhouse that the two individuals were in."

[27] The defendant further argues that because there was no evidence of communication among the officers as to the nature of the building materials located near the greenhouse, the court erred in relying on the collective knowledge doctrine. Having determined that the court's factual finding that the "lumber and piping . . . were observed by Moskowitz, who was familiar with the grow operation at the home," was not clearly erroneous, it is unnecessary to consider the collective knowledge of the police.

[28] The court determined that "[t]he defendant does not dispute that he was advised of his [rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]." The defendant argues on appeal that "there is a serious question based on [the] record whether the *Miranda* rights were ever given to [the defendant] prior to the custodial interrogation" and superficially makes the additional claim, without further analysis, that it "became unclear as to when the *Miranda* rights were given, if at all." The trial record reveals that the defendant did not challenge whether his *Miranda* rights were given. In his motion to suppress evidence, the defendant conceded that "[o]nce back at the property, law enforcement officers advised [the defendant] of [his] *Miranda* rights." Moreover, the defendant does not dispute that he signed the notice and waiver of rights form. We thus consider the defendant's challenge to contest the timing of the advisement of rights.

[29] The defendant does not argue that he did not understand his *Miranda* rights. See *State* v. *Azukas*, 278 Conn. 267, 288, 897 A.2d 554 (2006) ("It is useful to begin our analysis by noting that the defendant does not claim that he did not understand his *Miranda* rights. Rather, he makes the narrow claim that he never *waived* them." [Emphasis in original.]); *State* v. *Reynolds*, 152 Conn. App. 318, 354, 97 A.3d 999 (noting that defendant did not challenge fact that he received and understood *Miranda* warning and that he therefore "acted with full understanding of what rights were available to him following the *Miranda* warning"), cert. denied, 314 Conn. 934, 102 A.3d 85 (2014).

[30] The bottom portion of the notice and waiver of rights form states: "I waive these rights as indicated by placing my initials after one or more of the following statements." When asked by the court why the bottom portion of the form was not initialed by the defendant, Wiener testified: "It might have been an oversight that he didn't put his initials here, or maybe I didn't ask him to initial it, but I read the form in its entirety."

[31] Hall and Moskowitz also testified that the defendant did *not* say that he did not want to talk.

[32] The defendant additionally points to Hall's testimony in which Hall stated: "I don't think he ever actually said he didn't want to talk. . . . [I]nitially, he was lying to us and playing games as to him knowing anyone there or being present, and then once—once he was confronted with the fact that we knew he was lying to us, that he actually owned the house, he decided, he—at least, in our opinion, at that point—wanted to start being honest with us." Hall then stated that this occurred "[p]robably close to the time that he signed his rights, so it would have been around 4 o'clock."

[33] We again note that the defendant's claim is narrowly drawn. He does not argue that he did not understand or that he had any trouble communicating with the officers. See *State* v. *Wright*, 76 Conn. App. 91, 108, 818 A.2d 824 (2003) (considering totality of circumstances, including that "[a]t no

time did the defendant reveal that he did not understand his circumstances or that he had difficulty communicating with the officers"), cert. denied, 267 Conn. 911, 840 A.2d 1175 (2004).

———————————————